**United States District Court**
For the Northern District of California

1

2

3

4

5              UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA

7

8    UNITED STATES OF AMERICA,                    No. CR-13-0566 EMC

9              Plaintiff,
                                                 **ORDER GRANTING DEFENDANT**
10        v.                                     **LEE'S MOTION TO SUPPRESS**
                                                 **STATEMENTS**
11   RYAN CARROLL, *et al*.,
                                                 **(Docket No. 63)**
12             Defendants.
     _____/

13

14

15                    **I.    BACKGROUND**

16        Bright and early on October 18, 2011, Robert Lanham Lee awoke to the presence of police in

17   the doorway of his motel room.  The motel room was located in Vermont and was Lee's primary

18   residence at the time.  The police officers – Detective Wayne Hanson and Detective Cheryl Franco

19   of the Humboldt County Police Department – were there to invite Lee to the Brattleboro Police

20   Department to "chit-chat."  3:45.

21        Lee asked the detectives if he was under arrest.  Detective Hanson responded that Lee was

22   "absolutely not" under arrest.  4:17.  Rather, Hanson explained that they "need[ed] to talk to [Lee]

23   about something" down at the station, and would give him a ride back "after we're done chit-

24   chatting."  *Id*.  Hanson told Lee that he was not under arrest.  Each time Hanson said this to Lee, he

25   impressed upon Lee that the detectives "need[ed]" to talk to him down at the station.  The detectives

26   did not accede to Lee's request to take a shower and did not allow him to meet them at the station as

27   he suggested.  Instead, after a brief break in which Lee was allowed to put his shoes on, Lee was

28   directed to the detectives' vehicle – which was flanked by a marked police car.  Once outside,

Hanson searched Lee for weapons and put him in the car.  In the car, Lee asked the officers if he needed a lawyer.  Franco responded that she "do[esn't] think so."  10:20.  In support of Franco's assessment, Hanson explains that no lawyer is needed because "we're detectives and after we're done talking I'm going to give you a ride back so you won't need a lawyer 'cause we're just gonna talk and when you get tired of talking I'll give you a ride back."  10:25.

After about a seven minute car ride, Lee and the detectives arrived at the station.  Thanking Lee for coming down to the station, the officers reminded him that "[w]hen we're done we'll give you a ride home."  19:00.  The detectives situated Lee in the corner of a windowless interrogation room and began asking questions.  The interrogation turned accusatory quickly; within ten minutes, the officers warned Lee that they have already interrogated others regarding his involvement in a crime.  Throughout the interrogation the detectives presented evidence implicating Lee in the killing of Reetpaul Rana.

About eighty minutes into the interrogation Lee stated that he was scared of the detectives, and explained that generally "[he] do[esn't] talk to police" and that "when [he] get[s] arrested [he] do[esn't] even tell 'em [his] name."  1:20:00.  At this point, Hanson reminded Lee "you're not under arrest," to which Lee responded "I know."  1:20:20.  Over the course of the interrogation, Lee twice indicated he might want a lawyer present.  Those requests were not heeded.  Indeed, in response to Lee's second request, Detective Hanson said to Lee, "innocent people don't want attorneys."  1:58:25.  The "chit-chat" lasted a total of two hours, during which Lee made numerous incriminating statements.

Lee now moves to suppress those statements because (1) the officers failed to inform him of his Fifth Amendment rights prior to his custodial interrogation; and (2) the officers improperly continued their questioning of him after he invoked his right to counsel.

## II.   DISCUSSION

A.   Miranda Violation

The Constitution requires that a person be advised of certain rights if they are "in custody" and "subjected to interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 467-468.  The government's

**United States District Court**

For the Northern District of California

1    failure to provide such advisements renders statements made by a person during a custodial

2    interrogation inadmissible.  *See id.*

3         Here, the parties do not dispute that the detectives (1) failed to provide Lee with the a

4    *Miranda* warning; and (2) subjected Lee to an interrogation within the meaning of *Miranda.*  Thus,

5    the question of whether Lee's statements must be suppressed under *Miranda* turns on whether Lee

6    was in "custody" at the time he made them.

7         In determining whether an individual was in custody, a court must inquire as to whether "a

8    reasonable person would have felt that he or she was at liberty to terminate the interrogation and

9    leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  If, considering the totality of the

10   circumstances, a reasonable person would not feel free to leave the interrogation, then the

11   interrogation was custodial.  *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).  Generally, a

12   reasonable person would not feel free to leave if "something [is] said or done by the authorities,

13   either in their manner of approach or in the tone or extent of their questioning, which indicates that

14   they would not have heeded a request to depart or to allow the suspect to do so." *United States v.*

15   *Hall*, 421 F.2d 540, 545 (2d Cir. 1969); *see also Dyer v. Hornbeck*, 706 F.3d 1134, 1143 (9th

16   Cir.2013) (M. Smith, J., concurring) (explaining that circumstances and authorities' psychological

17   pressure created custody, despite the fact that detainee was aware of her physical ability to leave

18   during an unescorted bathroom break or out of an unlocked door of the interrogation room).

19        The Ninth Circuit has set forth the following non-exhaustive list of factors that are

20   particularly relevant to the custody inquiry: "(1) the language used to summon the individual; (2) the

21   extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of

22   the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain

23   the individual." *Kim*, 292 F.3d at 973 (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th

24   Cir. 2001)) (internal quotations omitted).  Other factors may also be "pertinent to, and even

25   dispositive of, the ultimate determination whether a reasonable person would have believed he could

26   freely walk away from the interrogators." *Id.* at 974.

27        Here, the first *Kim* factor – the language used to summon the defendant – weighs slightly in

28   favor of the government.  It is undisputed that the detectives requested Lee accompany them to the

**United States District Court**
For the Northern District of California

1   station, and that Lee accepted their invitation though his request to first shower and go on his own

2   was effectively refused.  At the motel, the detectives told Lee he was not under arrest and that they

3   would take him home if he "g[ot] tired of talking."  10:23.  However, they also said he could go

4   home only "when *we're* done talking," (emphasis added) which implies a degree of control by the

5   detectives; also, the detectives told Lee they did not have time for him to shower, and that he should

6   just put on his shoes and get in the car.  Further, the fact that the detectives insisted that they

7   "needed" to bring him down to the police station for questioning rather than interview him at his

8   motel or a public place nearby might suggest to a reasonable person that he was not free to leave or

9   disregard their request.  While Lee's initial submission to interrogation may have been voluntary, it

10  was barely so.  *See United States v. IMM*, 747 F.3d 754, 766 (9th Cir. 2013) (recognizing that while

11  voluntary contact with law enforcement is significant it cannot be the end of the custody inquiry).

12      Once at the police station, the detectives made statements and that more clearly implied a

13  significant level of control over Lee's ability to leave.  Shortly after arriving at the station, Lee was

14  again told, "When *we're* done, we'll give you a ride home."  19:05 (emphasis added).  That

15  statement implies the detectives maintained control over the length of the interview.  Later in the

16  interrogation, Hanson responds to Lee's inquiry about getting a lawyer, "*Like I said*, we are going to

17  give you a ride home **when we are done** talking with **you**."  1:26:12 (emphasis added).

18      To be sure, Lee was told at the outset he was not "under arrest."  At one point at the station,

19  Lee appears to acknowledge that he is not under arrest (1:20:00).  However, a reasonable lay person

20  would not necessarily equate the absence of an arrest with complete freedom to leave an

21  interrogation.  A lay person could well think that one could be detained without being formally

22  arrested; a lay person might well think that an arrest means being booked and jailed until released on

23  bail pending filing of criminal charges.  In fact, Lee's other statements indicate he believed that lack

24  of a formal arrest did not mean he thought he was free from constraints; in asserting that he wants to

25  know *what* he is "legally required to tell them," (1:42:00) Lee revealed the belief that he *was* legally

26  required to tell them something, and is obligated to submit to questioning.  And Lee did say late in

27  the interrogation that, "it feels like you guys want to arrest me."  1:58:45.  In short, these facts

28  indicate telling a subject of an interrogation that he is not under arrest does not clearly imply he is

4

United States District Court
For the Northern District of California

1  free to leave.

2      Significantly, the detectives never told Lee during the interrogation that he was free to leave

3  at any time.  The detectives' failure to inform Lee – even once – that he was free to leave contrasts

4  with *United States v. Crawford*, 372 F.3d 1048, 1051 (9th Cir. 2004).  In *Crawford*, a suspect in an

5  FBI interrogation room was told expressly that he "could leave at any time."  *Id.*  Shortly thereafter,

6  he was again told that "he was not under arrest and that he was free to leave."  *Id.* at 1052.  The

7  Ninth Circuit found the *repeated* reminder that the suspect was *free to leave* was "[p]erhaps most

8  significant for" determining the interrogation was non-custodial.  *Id.* at 1060.  *Cf. United States v.*

9  *Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) ("We have consistently held that a defendant is not in

10  custody when officers tell him that he is not under arrest *and is free to leave at any time*.") (emphasis

11  added); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005) (interrogation was non-custodial

12  in part because suspect was "told that his cooperation was voluntary and that he was free to

13  *terminate the interview at any time*") (emphasis added).  While Lee is informed he was not under

14  arrest at the outset and later into the interrogation, he was also told he would be taken home "when

15  we're done," not "whenever you'd like to leave."  Moreover, unlike the one hour interview in

16  *Crawford*, Lee's interrogation lasted nearly two hours: he was accusatorily interrogated for an hour

17  between the times he was told he was not under arrest.  It is only at 1:58:47 that Lee asks, "Well, can

18  we do that?" in response to Detective Franco's statement, "I didn't say I was going to arrest you.  At

19  all.  [. . . ] I'm taking you home" at which point the detectives acceded to Lee's desire to end the

20  interrogation.

21      Accordingly, while the first *Kim* factor weighs slightly in favor of the government, it does so

22  only as to the initial submission to the interview; once the interrogation commenced at the police

23  station, his ability to leave was not so apparent.

24      The second factor – the extent to which the defendant is confronted with evidence of guilt –

25  weighs strongly in favor of Lee.  Ten minutes into the interrogation, Franco aggressively confronted

26  Lee with the detectives' have previous interrogation evidence, stating: "[l]ike Mike, Cody, Ryan.

27  Don't think we haven't already talked to those guys."  26:20.  In addition, the detectives repeatedly

28  presented Lee with evidence that implicated his involvement in the killing of Rana.  *See* 26:20;

United States District Court

For the Northern District of California

1:18:00; 1:44:00; 1:51:00.  The detectives told Lee that others had fingered him as "maybe being

responsible" for the killing.  1:18:00.  Further, the detectives presented Lee with his cell phone call

history – pointing out that it indicated that (1) Lee had lied multiple times during the interrogation;

and (2) Lee had received suspicious phone calls potentially linking him to Rana's killing.  1:44:00.

The detectives pointed to the inconsistencies in Lee's story and presented or alluded to evidence that

implicated his guilt.  *Id.*  Such repeated suggestions of involvement in a serious crime weighs in

favor of finding custody.  *See United States v. Toliver*, 480 F. Supp. 2d 1216, 1219 (D. Nev. 2007)

(finding that an officer's use of witness statements to contradict a defendant indicated custody); *see

also Bassignani*, 575 F.3d at 884 ("We have found a defendant in custody when the interrogator

adopts an aggressive, coercive, or deceptive tone.").

The third factor – the physical surroundings of the interrogation – likewise weighs toward a

finding of custody.  Lee was interrogated in a small room at a police station located about a ten-

minute-drive from his motel, and was reliant upon the officers for his transport home.  *See

Crawford*, 372 F.3d at 1059 (recognizing that interrogations in a police station generally weighs

toward custody); *see also Toliver*, 480 F. Supp. 2d at 1219 (defendant's reliance on the police for

transportation indicated custody).  The police directed Lee to sit in the corner of a windowless room,

and placed themselves and a table between Lee and the only door.  *See* Exhibit B; *see also Kim*, 292

F.3d at 972 (finding that small windowless rooms that isolate or restrict a defendant can create a

"police dominated" environment and indicate custody).  Also, he had no obvious way of getting

home.  *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985) (a suspect's dependence on

the authorities for transportation weighs toward custody).

The fourth factor – duration of interrogation – also weighs in favor of a finding of custody.

Lee was interrogated for nearly two hours.  Courts have found that this duration generally weighs

toward a finding of custody.  *See United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013)

(finding that an interrogation lasting roughly two hours is indicative of custody); *see also

Bassignani*, 575 F.3d at 887 (noting that an interview lasting slightly more than two hours was

"lengthy" and weighed toward custody).  Nothing in the record or the government's arguments

indicates this case is an exception.  Thus, this factor also tilts in favor of Lee.

**United States District Court**
For the Northern District of California

The final factor – the degree of pressure applied to detain the defendant – weighs in favor of Lee. The detectives pressured Lee to cooperate by repeatedly implying that if he did not cooperate they would treat him as a suspect going forward. 1:33:00 (urging Lee to cooperate, Hanson states **right now** we're treating you as a witness. . .”). The accusatory nature of the interrogation added pressure, and his two requests for counsel were ignored or rejected. Although the detectives did not physically restrain Lee or threaten him explicitly, *see Hayes*, 2014 WL 5408425 at *2) (the fact that the defendant was handcuffed during the interrogation tilts the fifth *Kim* factor in favor of custody), this factor is hardly dispositive. *Barnes*, 713 F.3d 1200, 1203 (9th Cir. 2013) (finding custody where suspect was not physically restrained, but was psychologically restrained); *Dyer*, 706 F.3d at 1143-44 (M.Smith, J., concurring) (a custody does not hinge on a suspect's physical capacity to leave an interrogation).

Taken as a whole, the *Kim* factors favor a determination that a reasonable person in Lee's circumstances would not have felt free to leave the interrogation, and thus Lee was in custody within the meaning of *Miranda*. The government's argument to the contrary is unpersuasive. The government's argument relies almost entirely on the fact that (1) Lee was told he was not under arrest and accompanied the detectives voluntarily; and (2) the detectives did not handcuff Lee to the table or brandish their weapons during the interrogation. The voluntary nature of Lee's initial accompaniment is questionable as noted above. In any event, the first factor is not dispositive. *IMM*, 747 F.3d at 766.

The government's second point – that Lee was not physically restrained or threatened with weapons – makes little difference. While an individual who is physically restrained or threatened during an interview will almost certainly recognize he is not free to leave, it does not follow that the absence of such physical threats or restraints proves that an interview was non-custodial. *See Barnes*, 713 F.3d at 1203; *see also United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987) (finding custody despite absence of physical restraints or threats). Moreover, the government does not adequately account for the other *Kim* factors. The Court concludes once at the station, a reasonable person under the circumstances of Lee's interrogation would not have felt free to leave.

Accordingly, the Court **GRANTS** Lee's motion to suppress the statements he made to the

United States District Court

For the Northern District of California

government during his October 18, 2011 interrogation because Detectives Hanson and Franco should have but failed to provide Lee with a *Miranda* warning before subjecting him to a custodial interrogation.

B.    Right to Counsel

Lee argues additionally that his statements should be suppressed because the detectives violated his Fifth Amendment rights by continuing to question him despite his multiple requests for counsel.  Specifically, Lee points to two of his interview statements:

> (1)    "If I'm pointing somebody out at a lineup, I would like to have a lawyer here."  41:33.
>
> (2)    "If you guys are asking about a homicide, I'd like to have a lawyer with me that way I don't incriminate anybody or myself."  1:42:00.

The government responds that the first statement does not invoke his right to counsel because it is a conditional statement.  As to the second statement, the government concedes that it is a "close call," but seems to argue that the point is moot because it does not intend on introducing any statements made thereafter.

Under *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) all questioning of a suspect must cease upon the suspect's request for counsel.  *See also Smith v. Illinois*, 469 U.S. 91, 95 (1984).  If a suspect invokes his right to counsel, courts may admit his responses to questions thereafter "only on a finding that [the suspect] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  *Id*.  To trigger the protections of *Edwards*, a suspect must unambiguously and unequivocally request counsel.  *Davis v. United States*, 512 U.S. 452, 459 (1994).  This standard does not require that the suspect "speak with the discrimination of an Oxford don," rather it requires that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Id*.

In *Smith v. Endell*, 860 F.2d 1528 (9th Cir. 1988) the Ninth Circuit addressed whether a defendant's conditional statement constituted an invocation of his Fifth Amendment right to counsel. There, during interrogation, the defendant directed a statement to the authorities as follows:

United States District Court

For the Northern District of California

1             At this point, I think maybe you're looking at me as a suspect, and I
2             should talk to a lawyer. Are you looking at me as a suspect?

3 *Id*. at 1529.  The Ninth Circuit explained that this conditional statement was an invocation of the

4 defendant's right to counsel, *if* the officers he made it to *did* consider him a suspect.  *Id*. at 1531.

5 The court concluded that "[s]ince they knew him to be a suspect, questioning should have stopped

6 until an attorney was present."  *Id*. at 1532.

7        Here, both of Lee's statements invoking his right to counsel were conditional.  The first

8 statement came when the officers are asking him to pick someone out of a photo line up.  In

9 response, Lee indicates that if the officers are going to insist upon his "pointing somebody out at a

10 lineup, [he] would like to have a lawyer [present]."  41:33.  In response, the officers put the pictures

11 away, and the interview moves on.  Therefore, applying the reasoning set forth in *Endell*, since the

12 officers *did not* insist upon Lee picking someone out of a line up, Lee did not invoke his right to

13 counsel.  860 F.2d at 1532.

14        Lee's second statement conditions his invocation upon whether the officers are asking about

15 a homicide.  It is evident that the officers *were* asking about a homicide.  Therefore, applying *Endell*,

16 Lee's second invocation was operative and "questioning should have stopped until an attorney was

17 present."  *Id*. at 1532.  The government does not take issue with this as it does not seek to introduce

18 any statements Lee made after this point.  The tactics of Detectives Hanson ("innocent people don't

19 want attorneys") and Franco are classic examples of what police should *NOT* do when the subject of

20 an interrogation asks for counsel.

21 *///*

22 *///*

23 *///*

24 *///*

25 *///*

26 *///*

27 *///*

28 *///*

**United States District Court**
For the Northern District of California

1  Accordingly, for this additional reason, the Court **GRANTS** the motion to suppress

2  statements made after Lee's second request for counsel.

3  This order disposes of Docket No. 63.

4

5  IT IS SO ORDERED.

6

7  Dated:  April 28, 2015

8  _____
   EDWARD M. CHEN

9  United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28